United States District Court
Middle District of Florida
Jacksonville Division

SHARON MARIE DIETZ,

       *Plaintiff,*

V.

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant.*

NO. 3:19-CV-95-J-34PDB

---

# Report & Recommendation

This is a case under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying Sharon Marie Dietz's claims for disability insurance benefits.[1] This is the second time she has brought an action here for review of the decision below. *See* No. 6:16-cv-1421-Orl-37CM. She contends the Administrative Law Judge ("ALJ") erred by failing to state or explain the weight he

---

[1]The Social Security Administration ("SSA") uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York*, 476 U.S. 467, 471–72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900–404.906. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907–404.918. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929–404.943. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967–404.982. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. § 404.981. When a court remands a case, the Appeals Council may make a decision or remand the case to an ALJ with instructions to either take action and issue a decision or return the case to the Appeals Council with a recommended decision. 20 C.F.R. § 404.983. Unless the Appeals Council assumes jurisdiction, the ALJ's decision will be the Commissioner's final decision. 20 C.F.R. § 404.984.

was giving medical opinions about her mental limitations by two doctors (Jonas Trinidad, Psy.D., a consulting psychologist, and Kevin Ragsdale, Ph.D., a state-agency consultant) and by failing to properly consider her testimony about her pain and symptoms. Doc. 13 at 16–22. She seeks an award of benefits or vacatur and remand with a time limit for a new decision. Doc. 13 at 22–23. The Commissioner contends there is no error; to the extent there is error, the error is harmless; and to the extent there is harmful error, the only remedy available to Dietz is vacatur and remand. Doc. 14 at 4–16.

## I.   Background

Dietz was born in 1965. Tr. 80. She completed college and has worked as a medical-equipment-sales representative. Tr. 37, 175, 200, 407. She last worked in October 2011.[2] Tr. 39, 175. She is insured through 2016. Tr. 154.

Dietz has filed two applications for disability benefits: one on February 8, 2013, and one on August 22, 2016, while the denial of the first application was on appeal before this Court.[3] Tr. 80, 512, 594. In the first application, she alleged she had become disabled on October 5, 2011, from permanent nerve damage from a back injury. Tr. 80. In the second application, she alleged she had become disabled on February 13, 2015 (the day after the ALJ's denial of her first application, *see* Tr. 25), from the back injury as well as neuropathy, degenerative disc disease of the lumbar spine with radiculopathy, a history of colitis and "TMJ" (temporomandibular joint), a

---

[2]In a hearing before the ALJ, Dietz testified she worked only one day in 2012 after being on leave and receiving worker's compensation benefits because her boss told her she would be fired. Tr. 39. She added that she had been unable to do the work. Tr. 39.

[3]An application is effective until an ALJ issues a decision. 20 C.F.R. § 404.620(a). A claimant may file a new application after the first application period expires. *See id.*

Dietz's second application states the application date is August 22, 2016. Tr. 594. A remand order from the Appeals Council states the application date is August 18, 2016. Tr. 516. The precise date is immaterial to the issues Dietz raises here.

prolapsed heart valve, a disc herniation in the neck, major depressive disorder, and adjustment disorder. Tr. 478–79.

In the first case, the Honorable Roy Dalton ruled the ALJ had erred in his treatment of two doctors' medical opinions about Dietz's physical limitations. Tr. 492–511. When that case was remanded, Dietz's 2016 application was still under administrative review, and the Appeals Council directed the ALJ to consolidate the applications and proceed in one administrative case. Tr. 516. The Appeals Council vacated the ALJ's first decision, remanded the case to the ALJ for further proceedings consistent with Judge Dalton's order, and directed the ALJ to "offer the claimant the opportunity for a new hearing, take any further action needed to complete the administrative record, and issue a new decision." Tr. 516.

In a second decision, the same ALJ found no disability. Tr. 362–78. That is the decision now under review.

## II.   Dr. Trinidad's and Dr. Ragsdale's Opinions

### A.   *Dr. Trinidad's Opinion*

In December 2016, Dietz saw Dr. Trinidad at Hope Counseling Centers for a consultative exam in connection with her applications for benefits. Tr. 924.

In a report from the exam, under "Review of Records Provided by the Division of Disability Determinations," Dr. Trinidad summarized a September 2016 psychosocial assessment by a licensed marriage and family therapist. Tr. 924. The therapist found Dietz met the criteria for "Major Depressive, recurrent, moderate" and "Partner Relational problems, R/o adjustment disorder with mixed emotions." Tr. 924.

Under "General Observations," Dr. Trinidad wrote:

Mrs. Dietz is a married, Caucasian female, 51 years of age[.] She arrived

3

> at the scheduled evaluation on time. She drove to the appointment and she arrived alone. … She was interviewed alone and acted as the sole informant. Ms. Dietz was able to answer all questions presented but had some difficulties giving specific information and dates. … Eye contact through[out] the evaluation was good. During the evaluation, she displayed a positive attitude. Cooperation and effort were positive and appropriate. Behavior during the evaluation was remarkable for becoming tearful while discussing the mental health symptoms regarding her deteriorating relationship with her husband. The information provided appeared to be free of any deliberate attempt to misrepresent or misinform.

Tr. 924.

Under "Account of Present Medical/Mental Health Conditions," Dr. Trinidad recorded that Dietz had discussed her physical conditions and had conveyed "the main reason for filing for disability is related to both medical and mental health problems." Tr. 924. Dr. Trinidad wrote,

> Ms. Dietz reported current mental health conditions being remarkable for [d]epression and [a]nxiety correlated to physical pain and the emotional pain she experiences from ongoing marital conflict. Current mood was reported as "Not well" and affect appeared extremely labile. She had frequent episodes of crying uncontrollably when she discussed her husband's verbal abuse & demands for "spousal responsibilities" that are beyond her physical capability and her very low libido. She reported that the present conditions are impacted by "everything." Her husband[']s demands for her to perform her wifely duties and the extreme insensitive treatment of their 2 adopted daughters [sic]. She reported having a mental health treatment history remarkable for ongoing counseling with Ms. Guelseren, Licensed Marriage & Family therapist. She has her 10 year old daughter going to psychotherapy. Ms. Dietz reported having a trauma history remarkable for [sic]. She reported family mental health history being remarkable for "my mother has been depressed for the past 10 years and my daughter has ADHD[.]" Her husband believes the daughters['] behavior should be managed with good old Bible based discipline. There was no reported family substance abuse history.

Tr. 925.

Dr. Trinidad wrote, "The current level of mental health symptoms would best

4

be characterized as moderate." Tr. 925. (This appears to be Dr. Trinidad's characterization of Dietz's symptoms as opposed to a statement by Dietz, but the document is not clear on this point.)

Under "Activities of Daily Living," Dr. Trinidad recorded statements by Dietz. Tr. 925. She reported her sleep is "intermittent" because she worries "a lot" about her health, children, and marriage; she takes care of the children, prepares meals, cannot sit or stand for long, and often has to shift positions; and she used to play golf but cannot do much now.[4] Tr. 925. She reported being able to bathe, dress, and use the bathroom independently; move around without assistance; drive independently without difficulty; prepare food without assistance; and manage money effectively. Tr. 925. She reported being unable to complete basic household chores or shopping because of neck, back, and leg pain. Tr. 925. She reported sharing childcare responsibilities with her husband. Tr. 925.

Under "Significant History," Dr. Trinidad wrote that Dietz attends social gatherings like church regularly but cannot return to work because of "chronic neck, back, and leg pain due to [a] spinal injury.'" Tr. 925.

Dr. Trinidad reported the following findings from a mental-status evaluation. Tr. 926. Dietz was alert and oriented to person, place, situation, and time. Tr. 926. She displayed no gross gait abnormalities or significant problems with motor functioning. Tr. 926. Her rate of observed speech was "pressured" and the quality "soft." Tr. 926. Her speech content was relevant, coherent, and logical. Tr. 926. She demonstrated good attention and concentration by answering questions without distraction and completing alphabetic and numeric tasks without error. Tr. 926. Her mental flexibility and receptive language were good; she could spell "world" backward

---

[4]After the statement about Dietz not being be able to do much anymore, the report states, "cries again," inside quotation marks indicating her statements. Tr. 924. Whether she reported crying, or she started crying and Dr. Trinidad wrote that as an observation, is unclear.

and complete simple tasks of serial calculations without error. Tr. 926. She had no significant difficulties in processing speed. Tr. 926. Her receptive language was good; she completed all verbal commands presented without error. Tr. 926. Her expressive language was good; she completed all written tasks presented without error. Tr. 926. Her immediate memory was good; she could recall three of three words immediately after a short delay. Tr. 926. Her remote memory was adequate; she could recall specific details about past personal events. Tr. 926. Her mental computation was good; she could complete basic verbal arithmetic problems without error. Tr. 926. She displayed good social skills and abstract reasoning; good judgment related to self-care and social problem-solving; good insight; above-average intelligence; coherent, logical, and goal-directed thought processes; and age-appropriate and unremarkable thought form and content. Tr. 926. She denied having a history of suicidal or homicidal attempts or current ideations. Tr. 926. She denied having hallucinations. Tr. 926.

Under "Diagnostic Impressions," Dr. Trinidad wrote "Anxiety Disorder Due to [] Chronic neck, back and leg pain related to 'ruptured discs' and frequent stress headaches, prolapsed heart valve"; "Major Depressive Disorder Recurrent Episode, Moderate"; "Relationship Distress With Spouse[]"; and "Other Specified Trauma-and Stressor-Related Disorder." Tr. 927.

Under "Summary," Dr. Trinidad wrote that Dietz "appears to meet criteria for Depression, Anxiety both correlated to incapacitating medical condition and marital distress due to claims that her husband puts extreme demands on her to perform as a wife and her daughters to behave appropriately without medical/psychiatric intervention (one child has severe ADHD and anxiety[).]" Tr. 927. He continued:

> Ms. Dietz presents as being cognitively above average, academically competent and experienced but emotionally impaired due to a history of depression and anxiety related to her child sexual and emotional abuse. Her mother has a history of [d]epression and [a]nxiety. She reports however despite her efforts she is unable to fulfill most of her spousal duties (intimacy, chores, social activities with spouse and daughters)

6

due to chronic pain and fatigue due to heart prolapse. The overall presentation appeared valid and consistent with the reported conditions. The mental health symptoms based on report[s] and clinical observations appear to be moderately impacting activities of daily living, vocational performance, and interpersonal interactions. Current prognosis for Ms. Dietz is fair. In regards to financial management, Ms. Dietz is recommended to manage benefits and financial decisions.

Tr. 927.

## B.    Dr. Ragsdale's Opinion

In the same month (December 2016), Dr. Ragsdale reviewed the medical evidence of Dietz's mental impairments in connection with her second application for benefits. Tr. 467–69.

Dr. Ragsdale opined Dietz had severe affective and anxiety disorders and completed a "psychiatric review technique."[5] Tr. 467–69. Considering the "paragraph B" criteria, he opined Dietz had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of

---

[5]To evaluate medically determinable mental impairments at steps two and three of the sequential evaluation process, the SSA uses a "special technique"—the "psychiatric review technique"—to identify the need for additional evidence to determine the severity of impairments, to consider and evaluate functional limitations of any mental disorder relevant to the ability to work, and to organize and present findings in a "clear, concise, and consistent manner." SSA Program Operations Manual System (POMS) DI 24583.005.A. The SSA uses the technique by following five steps: (1) determine whether the claimant has a medically determinable mental impairment; (2) rate the degree of functional limitation resulting from the mental impairment; (3) determine the severity of the mental impairment; (4) determine whether the mental impairment meets or equals a listed impairment; and (5) document application of the technique. POMS DI 24583.005.B.

extended duration.[6] Tr. 468. He opined that the evidence did not establish the "paragraph C" criteria.[7] Tr. 468. Under "Additional Explanation," he added:

> This 51 year-old college grad has not worked since 10/2011. She is applying for disability due to limitations associated with multiple medical issues, chronic pain, and contemporaneous depression. Her prior application was based exclusively on somatic complaints and denied at the ALJ (2/2015) and AC (6/2016) levels.
>
> [Claimant] has no documented history of inpatient psychiatric admissions. In terms of outpatient treatment, she has seen a LMFT three times since 9/2016 for assistance in handling problems with her spouse re: parenting of their adopted daughters and his requests for intimacy that she is unable to fulfill due to her pain. The notes indicate that she presents as sad and labile. [Claimant] is not currently taking any psychotropic medication. The longitudinal records obtained from a number of [claimant's] somatic treating sources (2013–present) do not include any self-reports or medical findings indicative of clinically significant neuropsychiatric comorbidity.
>
> At the [consultative examination with Dr. Trinidad], [claimant's] overall appearance was acceptable; there were no obvious signs of self-neglect. She was sufficiently cooperative with the vendor and provided a satisfactory account of her current symptoms/daily activities and personal history. No features of endogenous/melancholic depression, profound anxiety, or acute mania were observed. She became tearful while discussing her husband's verbal abuse and demands for her to meet "spousal responsibilities." There were no indications of frank/latent psychosis or disordered mentation. There were also no

---

[6]The "paragraph B" criteria are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). The SSA considers the claimant's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3) (citing 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00E). To satisfy the "paragraph B" criteria, the mental impairment must result in "an 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A)(2)(b). The limitations found when assessing the "paragraph B" criteria are not an RFC assessment. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July 2, 1996). A mental RFC assessment "requires a more detailed assessment by itemizing various functions." Id.

[7]"Paragraph C" lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A).

findings suggestive of marked abnormalities in her comprehension, attention/concentration, or recent/remote recall. D[iagnoses]: Anxiety Disorder [not otherwise specified] to medical conditions, [Major Depressive Disorder], Recurrent, Moderate, Relationship Distress, Other Specified Trauma-and-Stressor-Related Disorder. [Medical Source Statement]: Based on anecdotal reports and clinical observations, [claimant's] mental health symptoms appear to be moderately impacting [claimant's] [activities of daily living], interpersonal interactions, and vocational performance. The overall degree of impairment suggested by this opinion is generally consistent with the attendant [mental status examination] and case record as a whole and therefore is accorded great weight in this assessment.

[Claimant's] alleged symptoms and limitations are reasonably consistent with the objective evidence of record. Overall, while the established [medically determinable impairments] do appear to [be] more than minimally limiting, the case record shows [claimant] remains sufficiently capable of executing basic, routine activities of daily living and sustaining a level of concentration/persistence sufficient for completing ordinary life tasks. See [Mental Residual Functional Capacity Assessment].

Tr. 468–69.

In the "Mental Residual Functional Capacity Assessment," under "Does the individual have understanding and memory limitations," Dr. Ragsdale wrote, "Yes." Tr. 471. He opined Dietz is not significantly limited in the ability to remember locations and work-like procedures; has no evidence of a limitation in the ability to understand and remember very short and simple instructions; and is moderately limited in the ability to understand and remember detailed instructions. Tr. 471.

Under "Does the individual have sustained concentration and persistence limitations," Dr. Ragsdale wrote, "Yes." Tr. 472. He opined there is no evidence that Dietz is limited in the ability to carry out very short and simple instructions. Tr. 471. He opined she is moderately limited in the ability to carry out detailed instructions; is moderately limited in the ability to maintain attention and concentration for extended periods; and is not significantly limited in the ability to perform activities within a schedule, maintain regular attendance, be punctual within customary

tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions. Tr. 472. He opined she is moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 472.

Under "Does the individual have social interaction limitations," Dr. Ragsdale wrote, "Yes." Tr. 472. But he opined Dietz is not significantly limited in the ability to interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Tr. 472.

Under "Does the individual have adaptation limitations," Dr. Ragsdale wrote, "Yes." Tr. 473. He opined Dietz is moderately limited in the ability to respond appropriately to changes in the work setting; has no limitation in the ability to be aware of normal hazards and take appropriate precautions and travel in unfamiliar places or use public transportation; and is not significantly limited in the ability to set realistic goals or make plans independently of others. Tr. 473.

Under "Additional Explanation," Dr. Ragsdale wrote:

As reflected by the above ratings, some of [claimant's] work-related abilities/skills may be moderately limited at times due to psychiatric factors. Even so, the balance of the relevant evidence suggests that at a minimum [claimant] has the capacity to:

A. Comprehend/memorize simple, succinct job instructions and learn/follow formulaic work processes[.]

B. Make basic job-related decisions, adhere to a typical work schedule, and perform slower-paced [simple, routine tasks] for 2 hour

10

increments—without needing continual reminders or some other form of specialized supervision.

C. Display an acceptable level of social propriety during routine job-related interpersonal interactions and abide by the general precepts set forth by employers governing workplace decorum and personal appearance.

D. Adjust appropriately to modifications in vocational duties that are instituted with advanced notice, implemented gradually, and/or accompanied by solid rationale; follow occupational safety guidelines; and secure transportation to a jobsite.

Tr. 473.[8]

---

[8]In March 2017, a second state-agency consultant at the reconsideration level, James Levasseur, Ph.D., found Dietz had no severe mental impairments and only mild limitations in the "paragraph B" criteria (ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage oneself). Tr. 483–85. Neither the ALJ nor the parties discuss Dr. Levasseur's opinion in the decision or briefs.

### III.   ALJ's Decision

The ALJ entered a decision on October 11, 2018. Tr. 362–78. The period at issue is October 5, 2011 (the originally alleged onset date), to December 31, 2016 (the date last insured). The ALJ's findings pertain to that period only.

At step one of the five-step sequential process,[9] the ALJ found Dietz had not engaged in "substantial gainful" work activity.[10] Tr. 364.

At step two, the ALJ found Dietz had suffered from severe physical impairments of degenerative disc disease of the lumbar spine, status post microdiscectomy, fibromyalgia, a history of TMJ, and a history of colitis. Tr. 364. He found her mental impairments were not severe, explaining:

> The claimant's medically determinable mental impairments of depression and anxiety, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere. The record does not establish any ongoing treatment for any mental health condition. The claimant established primary car[e] with Kishake Kurian, M.D. Progress notes from March 2014 through August 2016 document that the claimant has maintained a normal mental status. The claimant was noted to have an appropriate mood and affect, was

---

[9]The SSA uses a five-step sequential process to decide if a person is disabled, asking (1) whether she is engaged in substantial gainful activity, (2) whether she has a severe impairment or combination of impairments, (3) whether the impairment or combination of impairments meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) whether she can perform any of her past relevant work given her residual functional capacity ("RFC"), and (5) whether there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

[10]"Substantial gainful work activity is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. "Substantial work activity is work activity that involves doing significant physical or mental abilities." *Id.* § 404.1572(a). "Gainful work activity is work activity that [a claimant] does for pay or profit [or] is usually done for pay or profit, whether or not a profit is realized." *Id.* § 404.1572(b).

fully oriented, and demonstrated normal insight and judgment (Exhibit 19F) [records of Dr. Kurian].

Tr. 364–65.

Referencing Dr. Trinidad's report from the December 2016 consultative exam, the ALJ continued:

> During a December 2016 psychological evaluation with [Dr. Trinidad], the claimant's mental status was largely unimpressive. The claimant was fully alert and had soft speech, of which her content was relevant, coherent, and logical. The claimant demonstrated good attention and concentration, as she was able to attend to the evaluator's questions throughout the interview without distraction and was able to complete tasks of alphabetic and numeric reiteration without errors. Mental flexibility appeared to be good as she was able to spell the word "world" backward and complete simple tasks of serial calculations without errors. Ms. Dietz did not display any significant difficulties in processing speed. Receptive language appeared to be good as she was able to complete all verbal commands presented without errors and expressive language appeared to be good as she was able to complete all written tasks presented without errors. Immediate and Remote memory appeared adequate. She demonstrated good mental computation [and] was able to complete basic verbal arithmetic problems without errors. The claimant [had] good social skills. Abstract reasoning appeared good. Judgment related to self-care and social problem-solving appeared to be good as evidenced by an understanding of personal safety (Exhibit 26F). The claimant is not currently under the care of any mental health professional nor is she taking psychotropic medications prescribed by any provider. The record does not reveal any significant mental health functional limitations that cause any limitations with regards to her ability to work.

Tr. 365.

The ALJ then discussed the four "paragraph B" criteria:

> In making this finding, the undersigned has considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.

Tr. 365.

For the first functional area (understanding, remembering, or applying information), the ALJ reasoned:

> In this area, the claimant had no limitation. During a December 2016 evaluation, the claimant's immediate memory appeared to be good as she was able to recall three of three words immediately after presentation and recent memory appeared to be good as he was able to recall 3 of the 3 words presented after a short delay. Remote memory appeared to be adequate as she was able to recall specific details regarding past autobiographical events. She demonstrated good mental computation [and] was able to complete basic verbal arithmetic problems without errors. Overall intelligence was approximated as being above average based on the observed vocabulary, usage, and fund of general information. General thought processes appeared to be coherent, logical, and goal directed (Exhibit 26F [Dr. Trinidad's report]). In this area, the claimant's testimony and the objective medical evidence would indicate that from a mental standpoint the claimant has no limitation.

Tr. 365.

For the second functional area (interacting with others), the ALJ reasoned:

> In this area, the claimant had a mild limitation. In a third party function report, Mr. Dietz, the claimant's husband reported that the claimant utilizes Facebook and email. The claimant attends church and takes the kids to lessons, contrary to the claimant's recent testimony at the September 2018 hearing (Exhibit 21E [Mr. Dietz's report]). In this area, the claimant's testimony and the objective medical evidence would indicate that from a mental standpoint the claimant has no more than [a] mild limitation.

Tr. 365.

For the third functional area (concentrating, persisting, or maintaining pace), the ALJ reasoned:

> In this area, the claimant had a mild limitation. During a December 2016 evaluation, the claimant demonstrated good attention and concentration, as she was able to attend to the evaluator's questions throughout the interview without distraction and was able to complete tasks of alphabetic and numeric reiteration without errors (Exhibit 26F

14

[Dr. Trinidad's report]). In this area, the claimant's testimony and the objective medical evidence would indicate that from a mental standpoint the claimant has no more than [a] mild limitation.

Tr. 366.

For the fourth functional area (adapting or managing oneself), the ALJ reasoned:

In this area, the claimant had a mild limitation. At the hearing held on January 20, 2015, the claimant testified that she drove five days per week, primarily to take her four year old, special needs daughter to speech therapy. At that time, the claimant reported she home schooled her two girls and did all the teaching for two years prior to the initial hearing. She reported she was able to vacuum, complete laundry, and cook. She also reported she was able to manage her personal hygiene. At the recent hearing, held September 24, 2018, the claimant purported to not have as much input in her daughters' homeschooling activities. The claimant alleges that her husband, who is the sole provider for the household and an independent medical sales person, primarily does most of the current schooling for the two homeschooled daughters while he works. She claims that he works from home 75 percent of the time and is in the field 25 percent of the time (at the time of the second hearing). The claimant also claims that while he has the responsibility of running his business and homeschooling, he also manages the daily needs of the home, including cooking breakfast, washing the morning dishes, taking the children to their required school lessons, sports and music lessons, as well as maintaining the laundry and household chores. The claimant also purports that she only drives once weekly and does not assist much in transporting her daughters nor does she go grocery shopping or accompany her husband when grocery shopping. In a third party function report, Mr. Dietz, the claimant's husband reported that the claimant takes care of the children, but he will assist her throughout the day. The claimant[] makes the children's lunch. The claimant[] facilitates the girls['] schooling. The claimant is able to fold laundry, sweep the floo[r], and wash a few dishes, and can tidy up the kitchen. Mr. Dietz reports that the claimant can go out alone and drive. He reports the claimant can pay bills, handle a savings account, and use a checkbook or money order (Exhibit 21E [Mr. Dietz's report]). In this area, the claimant's testimony and the objective medical evidence would indicate that from a mental standpoint the claimant has no more than [a] mild limitation.

Tr. 366.

15

The ALJ concluded, "Because the claimant's medically determinable mental impairments caused no more than 'mild' limitation[s] in any of the functional areas, they were nonsevere[.]" Tr. 366. The ALJ did not discuss Dietz's mental limitations or any other opinions concerning them further.

At step three, the ALJ found Dietz had had no impairment or combination of impairments that meets or medically equals the severity of any impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 367. He expressly considered Listing 1.02 (major dysfunction of a joint) and Listing 1.04 (disorders of the spine). Tr. 367.

The ALJ found Dietz had possessed the residual functional capacity ("RFC")[11] to perform "light work"[12] with additional physical limitations:

> [S]he has had [at] all times through her date last insured the ability to lift carry and push pull 20 pounds occasionally (up to one-third of the day), and 10 pounds frequently (up to two-thirds of the day): sit for four hours at a time and a total of eight hours during an eight hour day, and stand and/or walk for two hours at a time and a total of six hours during an eight hour day. She could not climb ropes, ladders and scaffolds, but could occasionally climb stairs ramps, balance and stoop. She could not crouch and crawl. She had no limitations regarding manipulation, vision or communication. She had environmental limitations precluding concentrated exposure to extreme cold, vibration and work hazards including unprotected heights and dangerous machinery. **She had no**

---

[11]A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The SSA uses the RFC at step four to decide if the claimant can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy she can perform. 20 C.F.R. § 404.1545(a)(5). The existence of an impairment, alone, does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). The ALJ need not defer to any medical opinions concerning the RFC. *See* 20 C.F.R. § 404.1527(d)(3).

[12]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567.

**significant mental limitations**.

Tr. 367 (emphasis added).

At step four, the ALJ found Dietz had been able to perform her past relevant work as a manufacturer's representative and therefore had not been disabled. Tr. 376.

As an alternative finding, at step five, the ALJ found Dietz had been able to perform "unskilled"[13] work as an office helper, mail-room clerk, and ticket seller and those jobs had existed in significant numbers in the national economy.[14] Tr. 377. He therefore found no disability. Tr. 378.

## IV.   Standard of Review

A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks and alteration omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* "Substantial evidence … is more than a mere scintilla. …

---

[13]"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the SSA] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. § 404.1568.

[14]Under the five-step sequential process, if the SSA finds disability or no disability at a step, it does "not go on to the next step." 20 C.F.R. § 404.1520(a)(4).

It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

If substantial evidence supports an ALJ's decision, a court must affirm, even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

The substantial-evidence standard applies only to factual findings. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). "The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoted authority and alterations omitted).

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). If "remand would be an idle and useless formality," a reviewing court need not "convert judicial review of agency action into a ping-pong game." *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).

## V.    Law & Analysis

To obtain benefits, a claimant must demonstrate she is disabled. 20 C.F.R. § 404.1512(a). A claimant is disabled if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Regardless of its source, the Social Security Administration ("SSA") "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c).[15] "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). If an ALJ does not "state with at least some measure of clarity the grounds for his decision," a court will not affirm simply because some rationale might have supported it. *Id.*

An ALJ must consider all relevant record evidence. 20 C.F.R. § 404.1520(a)(3). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted).

An ALJ's determination may be implicit, but the "implication must be obvious to the reviewing court." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983). In unpublished opinions, the Eleventh Circuit has held that failure to explicitly state the weight given to an opinion may be harmless if the opinion is consistent with the ALJ's decision or the decision is in-depth, shows thoughtful consideration of the findings, and does not leave the court wondering how the ALJ reached his decision.

---

[15]"For claims filed … before March 27, 2017, the rules in [20 C.F.R. § 404.1527] apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply." 20 C.F.R. § 404.1527. Because Dietz filed her claims before March 27, 2017, the rules in § 404.1527 apply here.

*See Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016); *East v. Barnhart*, 197 F. App'x 899, 901 n.3 (11th Cir. 2006).

Dietz has established error that is not harmless. Despite the requirement he do so, the ALJ neither stated the weight he was giving Dr. Trinidad's opinion—much less "with particularity"—nor explained the "reasons therefor." *See Winschel*, 631 F.3d at 1179 (quoted).

Dr. Trinidad concluded: Dietz's "overall presentation appeared valid and consistent with the reported conditions"; her "mental health symptoms based on report[s] and clinical observations appear to be moderately impacting activities of daily living, vocational performance, and interpersonal interactions"; and her prognosis is "fair." Tr. 927. The ALJ's failure to state the weight he was giving Dr. Trinidad's opinion, failure to mention those conclusions in his summary of Dr. Trinidad's opinion, and finding that the record revealed no "significant mental health functional limitations that cause any limitations with regards to her ability to work," together make unclear whether the ALJ overlooked those conclusions or rejected them based on the parts of Dr. Trinidad's opinion the ALJ summarized (mainly the findings from the mental-status exam) and other evidence.

The Commissioner observes the ALJ need not cite every piece of evidence and argues the decision shows the ALJ considered Dr. Trinidad's opinion. Doc. 14 at 6. That argument fails. While the ALJ did not have to summarize all of the conclusions in Dr. Trinidad's opinion, and while the decision shows the ALJ considered Dr. Trinidad's opinion, the decision lacks clarity on the weight the ALJ was giving Dr. Trinidad's opinion and the reasons therefore. *See Colon*, 660 F. App'x at 870.

The Commissioner argues the ALJ did not have to give a specific weight to Dr. Trinidad's opinion because it was conclusory and included no specific functional limitation, primarily relying on *Banks v. Comm'r Soc. Sec.*, 686 F. App'x 706, 711 (11th Cir. 2017), in which the Eleventh Circuit held the ALJ did not have to

specifically refer to a doctor's statement that the claimant's arthritis led to significant and marked functional limitation because the statement was vague, conclusory, and failed to explain the type of marked functional limitation or the domains in which his arthritis limited him. Doc. 14 at 7. That argument also fails. Notwithstanding that Dr. Trinidad's report appears detailed and supported rather than vague and conclusory, the ALJ's error is not in failing to summarize every aspect of the opinion but in failing to provide clarity on the weight he gave it and the reasons therefore.

Regardless, Dietz has established other error that is not harmless. Despite the requirement he do so, the ALJ neither stated the weight he was giving Dr. Ragsdale's opinion—much less "with particularity"—nor explained the "reasons therefor." *See Winschel*, 631 F.3d at 1179 (quoted). Indeed, the ALJ did not reference Dr. Ragsdale's opinion at all.

Dr. Ragsdale opined Dietz had moderate difficulties in maintaining concentration, persistence, or pace, Tr. 468; and is moderately limited in abilities to understand and remember detailed instructions, Tr. 471, carry out detailed instructions, Tr. 472, maintain attention and concentration for extended periods, Tr. 472, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, Tr. 472, and respond appropriately to changes in the work setting, Tr. 473. Dr. Ragsdale further opined her work-related ability and skills may be "moderately limited at times due to psychiatric factors" but she could still comprehend and memorize "simple, succinct job instructions," learn and follow "formulaic work processes," make "basic job-related decisions," perform "slower-paced" simple, routine tasks at two-hour increments, and appropriately adjust to changes in work duties with advance notice. Tr. 473. With no reference to Dr. Ragsdale's opinion and no mental limitations in the RFC, neither the weight the ALJ gave the opinion nor the reasons therefore can be inferred from the decision.

The Commissioner does not dispute the ALJ erred in failing to state the weight he was giving Dr. Ragsdale's opinion or the reasons therefore. *See generally* Doc. 14 at 7–9. Instead, the Commissioner argues any error is harmless because Dr. Ragsdale's opinion is consistent with the ALJ's step-five finding that Dietz could perform three unskilled jobs, citing cases that hold failing to weigh a medical opinion is harmless if limitations in the opinion would not affect a claimant's ability to perform the jobs identified. Doc. 14 at 8–9 (citing *Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008), *Timmons v. Comm'r of Soc. Sec.*, 522 F. App'x 897, 906 (11th Cir. 2013), and *Jones v. Comm'r of Soc. Sec.*, 492 F. App'x 70, 73 (11th Cir. 2012)).[16]

The Commissioner's argument fails. The office-helper job identified by the ALJ at step five has a reasoning level of two: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations."[17] 1991 WL 672232 (DOT# 239.567-010). The mail-room-clerk and ticket-seller jobs identified by the ALJ at step five have a reasoning level of three: "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." 1991 WL 671813 (DOT# 209.687-026 [mail clerk]), 1991 WL 671853 (DOT# 211.467-030 [ticket seller]). Unskilled jobs with reasoning levels two or three are not necessarily consistent with someone who has moderate difficulties in maintaining concentration, persistence, or pace; who has moderate limitations in abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal

---

[16]In *Timmons*, for example, there was no error in the ALJ's failure to include a doctor's squatting limitation in the RFC because the identified jobs involved no squatting. *See Timmons*, 522 F. App'x at 906.

[17]The Dictionary of Occupational Titles assigns each job a reasoning level, with one the lowest and six the highest. Dictionary of Occupational Titles, App'x C, 1991 WL 688702 (4th ed. rev'd 1991).

workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting; and who is limited to comprehending "simple, succinct job instructions," learning and following "formulaic work processes," making "basic job-related decisions," performing "slower-paced" simple, routine tasks at two-hour increments, and appropriately adjusting to changes in work duties with advance notice.[18] *See* Tr. 468–473.

While Dietz is correct that the ALJ erred in failing to weigh Dr. Trinidad's and Dr. Ragsdale's opinions and the errors were not harmless, Dietz is incorrect about the relief available to her. Citing *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), Dietz contends, "The Eleventh Circuit has held that the court may reverse a case for an award of benefits where the claimant has suffered an injustice." Doc. 13 at 22. Based on that authority, she asks the Court to order remand for an outright award of benefits—not further administrative proceedings—because she has had to wait for more than six years for administrative proceedings based on the correct legal standards. Doc. 13 at 22–23. Citing no authority, she alternatively asks for remand with a "reasonable" deadline to make a final decision. Doc. 13 at 23.

Dietz's reading of *Walden* is too broad. In *Walden*, the Eleventh Circuit held the ALJ erred by applying an improper legal standard, failing to address the claimant's testimony and other evidence of pain, failing to make credibility findings, failing to develop the record, and exhibiting "total disregard" of "unrefuted evidence" of disability. 672 F.2d at 837. The Eleventh Circuit emphasized that the claimant's

---

[18]Dietz argues the ALJ erred by failing to state the weight he gave Dr. Trinidad's and Dr. Ragsdale's opinion and the reasons therefore, but, without briefing, she states that substantial evidence does not support the ALJ's finding of no significant mental limitations. Doc. 13 at 18. Contrary to that statement, there may well be substantial evidence to support that finding. Reversal and remand is warranted not for that reason but because the ALJ failed to state the weight he gave Dr. Trinidad's and Dr. Ragsdale's opinion and the reasons therefore. The Court may not provide that weight and rationale in the first instance.

"unrefuted evidence established she was unable to perform her prior work," the "burden shifted to the [Commissioner] to show that [she] is capable of engaging in some substantial gainful activity," and the "[Commissioner] offered no evidence in support of his burden." *Id.* at 840. The Eleventh Circuit concluded, "Due to the perfunctory manner of the hearing [15 minutes], the quality and quantity of errors pointed out, and the lack of substantial evidence to support the ALJ's decision, this court is of the opinion the appellant has suffered an injustice." *Id.* The Eleventh Circuit ended the decision, "This case is hereby reversed and judgment rendered for the appellant." *Id.*

A decision's "binding power as precedent … comes not from what the opinion says or its words imply," but from what the court in that case decided "considering the facts then before the court." *New Port Largo, Inc. v. Monroe Cty.*, 985 F.2d 1488, 1500 (11th Cir. 1993) (Edmondson, J., concurring). Contrary to Dietz's assertions, the Eleventh Circuit in *Walden* did not hold a court may reverse a case for an award of benefits whenever the claimant has suffered what the court considers an injustice, and certainly did not hold an injustice occurs where, as here, the administrative process has been delayed because an ALJ has twice erred, regardless of whether the claimant has established disability. Having provided no authority for either remand for an outright award of benefits or for remand with a deadline under these circumstances, neither form of relief is warranted.[19]

Assuming authority for an award of benefits based on a finding of an injustice, no such finding is warranted here.[20] The ALJ issued a lengthy and otherwise

---

[19]The Eleventh Circuit *has* held a court may reverse for an outright award of benefits if the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Dietz does not contend, and the record does not support, that the evidence establishes disability with no doubt or that the circumstances in *Walden*, including unrebutted evidence of disability, are present here.

[20]Some district courts have interpreted *Walden* broadly to support remanding a case for an award of benefits if there is an injustice. *See, e.g.*, *Weary v. Comm'r of Soc.*

24

thorough opinion discussing Dietz's physical limitations in an effort to comply with the remand order directing reconsideration of medical opinions on physical impairments. *See generally* Tr. 362–78. Dietz alleged no mental limitations in her first application, and substantial evidence may support a finding she has minimal or no mental limitations. Indeed, at the hearing before the ALJ after remand, neither Dietz nor her counsel discussed mental limitations as part of the reason for her disability and discussed physical limitations only. *See generally* Tr. 387–438. The delay—while certainly long—is not shockingly long for these types of matters and may be attributable to factors not indicative of an injustice, including administrative and judicial backlogs caused by substantial caseloads. Moreover, Dietz provides insufficient information and justification for a "reasonable" deadline, which would require the SSA to prioritize her applications over those of others who may have had to wait longer. As the Commissioner responds, Doc. 14 at 16 n.8, remand for further administrative proceedings—not for outright award of benefits—is the only appropriate remedy.

In light of that remedy, the Court need not decide Dietz's remaining argument that the ALJ failed to properly weigh her testimony about her symptoms and limitations by relying on an older description of her activities of daily living that did not reflect her recent, more limited activities, Doc. 13 at 20–21. While his consideration of her testimony primarily dealt with her physical limitations,

---

*Sec.*, 6:14-cv-1742-Orl-GJK, 2016 WL 1030800, at *7 (M.D. Fla. Mar. 15, 2016) (unpublished); *Quanstrom v. Comm'r of Soc. Sec.*, No. 6:15-cv-990-Orl-37GJK, 2016 WL 11469164, at *8 (M.D. Fla. June 23, 2016) (unpublished), report and recommendation adopted, 2016 WL 3769958. Courts that have remanded for an award of benefits based on a finding of injustice have done so on egregious facts absent here. *See, e.g.*, *Green v. Comm'r of Soc. Sec.*, No. 6:18-cv-1095-Orl-41GJK, 2019 WL 1745372, at *1 (M.D. Fla. Apr. 18, 2019) (unpublished) (finding an injustice where the plaintiff underwent three administrative hearings, three appeals, and two remands over 11 years); *Rainey v. Comm'r of Soc. Sec.*, No. 5:17-cv-541-Oc-PRL, 2018 WL 3830069, at *2–4 (M.D. Fla. Aug. 13, 2018) (unpublished) (finding an injustice where the plaintiff underwent four administrative hearings, three appeals, and the Commissioner failed to follow the Court's instructions on remands over 10 years).

reconsideration of Dr. Trinidad's and Dr. Ragsdale's opinions could affect the consideration of her testimony because any mental limitations could relate to her activities of daily living. *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (declining to address issues likely to be reconsidered on remand).

## VI.   Recommendations[21]

The undersigned recommends:

**(1)**   vacating the Commissioner's decision;

**(2)**   remanding the case to: (a) evaluate Dr. Trinidad's and Dr. Ragsdale's opinions; (b) state the weight given to those opinions and the reasons therefore; (c) reevaluate the credibility findings as warranted; and (d) take any other necessary action; and

**(3)**   directing the Clerk of Court to: (a) enter judgment for Sharon Dietz and against the Commissioner of Social Security under sentence four of 42 U.S.C. § 405(g); and (b) close the file.

**Entered** in Jacksonville, Florida, on February 3, 2020.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   The Honorable Marcia Morales Howard
     Counsel of Record

---

[21]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.